## MENEFEE & AL.

*v.*

## MARGE & AL.

*(Supreme Court of Appeals of Virginia, January 12, 1888.)*

[4 S. E. Rep. 726.]

**Executors and Administrators*—Sale of Realty—Failure to Serve Heir with Notice.**

A bill was filed praying the sale of decedent's land to pay debts, and for distribution; the widow joining, and agreeing to commute her life-right for its fee-simple value. Service upon one non-resident heir was had by publication, as to whom decree was taken as confessed, and sale confirmed to the purchaser of the whole estate: *held*, that the purchaser acquired a valid title, except as to the non-resident heir, with whom he was a tenant in common.

**Same—Same—Same—Effect.**

Where defective notice was had upon an heir in an action for distribution, and for sale of realty, who did not join, or in any manner assent, either to the original or any subsequent proceeding of the court in the sale of the decedent's realty, all such proceedings as to such heir are nullities.

**Same—Same—Same—Assumption of Debt by Purchaser.**

Where the purchaser at a judicial sale of land, of which one heir, a non-resident, had no notice, agreed to pay a lien thereon, it being agreed that a sufficient amount of the purchase price should be retained for that purpose: *held* that, even if the non-resident heir had been a proper party in the original proceeding, the decision of the court that her share of the estate was liable to the purchaser's estate for any part of the debt so provided against, and that the same be sold therefor, was error.

**Same—Rights of Creditors—Sale of Realty—Liability of Purchaser.**

The fact that there is sufficient personalty with which to pay general creditors does not make their claims any less liens on the

*See monographic note on "Executors and Administrators," Va. Rep. Anno.

decedent's realty; and where suit for administration was commenced, to which the purchaser of the realty belonging to the estate was a party, and knew there were other debts, aside from the one he assumed: *held*, that he took the land subject to the lien of the other creditors, and was liable therefor to the extent of his purchase, but not for after-accrued rents and profits.

### Descent and Distribution—Liability of Heir—Sale of Realty by Executor—Failure to Serve Heir with Notice.

The interest of an heir to real estate, not conveyed by a judicial sale, by reason of defective notice of the action, is still liable to the claims of general creditors of the decedent, but cannot be sold therefor, until the liability has been adjudicated, the amount judicially determined, and an option given the heir to pay without sale.

### Same—Sale of Realty—Interest of Heirs—Estimation of Value.

Where the whole of the lands of an estate were sold at a uniform price per acre, and no reason appeared why one part of the land might not be worth as much as any other: *held*, that each individual interest of the heirs should be estimated on the one basis.

### Subrogation—Sale of Decedent's Realty—Assumption of Debt by Purchaser.

Where a party had assumed a debt, and retained the consideration therefor out of the purchase price of lands bought by him at the time of the purchase, and against which the debt was a lien, he cannot become an assignee of the debt and lien, nor render himself entitled to subrogation thereto as against the estate, or any one claiming thereunder.

### Estoppel—By Deed.

The purchaser at a judicial sale of lands, who was a party to the administration proceedings, assumed the payment of a lien thereon, and retained of the purchase price so much thereof as "is equal to that debt, including interest to this time," covenanting to keep the first parties, the estate, and all persons claiming thereunder, harmless by reason of such debt, is estopped from afterwards asserting that he did not retain enough.

### Courts—Objection to Jurisdiction—Record.

Where no direct proof of the fact relied on, in an objection to the jurisdiction of the court, appeared in the record, and it also appeared that, if the proceedings were annulled, it would operate great injustice, and an inextricable confusion of titles: *held*, the objection should not be sustained.

Appeal from circuit court, Albemarle county.

In March, 1864, Morton Marge and Caroline H., his wife, exhibited their bill of complaint in the circuit court of Albemarle county against Mary F. G. Voss ; Julius M. Dashiell, and Mary T., his wife ; Emily G. Voss ; Susan F. Voss ; John S. Knox, Jr., trustee of Robert S. Voss, deceased ; Douglas H. Gordon, trustee of Bazil T. Gordon and Skipwith Gordon, children of Bazil B. Gordon, deceased ; and the said Bazil T. Gordon, Skipwith Gordon, and the personal representative of Robert S. Voss, deceased ; the said Morton Marge, alleging, among other things, that the estate of said Robert S. Voss consisted, in addition to certain personalty, of 533 acres of land, and praying that it be sold, and the proceeds applied, as far as possible, to the payment of debts of the decedent, and the balance distributed among the parties entitled thereto. Service by publication was issued against J. M. Dashiell and Mary, his wife, as non-resident defendants, which was of no effect as against them. Decree was taken as against all parties, and the sale, conveying the whole of the land to H. L. Kent, was confirmed by decree of the court, May 12, 1864. On the eighth October, 1868, Joseph Ried and John Jett, Daniel W. Botts and Carnet M. Walden, R. H. Buckner and John S. Buckner, and Patrick Linane, unsatisfied creditors of the estate of Robert S. Voss, deceased, filed their bill of review in the circuit court of Rappahannock, praying that the decree of October 17, 1866, confirming a report of Commissioners Watson and Michie, as to what had been done with certain proceeds of the sale, be set aside, and that the estate of R. S. Voss, deceased, be subjected to the payment of debts. In 1869, Kent filed his answer, reciting his purchase at the commissioners' sale, and insisting that his title to the lands was good, except as to the interest of Dashiell, and that the creditors must look to the fund in court. On September 25, 1873, the court entered a decree declaring that said Kent's heirs at law had a good title to the land, except as to the interest

of Dashiell and wife, and as to that interest they had no title, and ordered that accounts be taken as to the value of the real estate, annual and fee-simple, of the debts and assets of the decedent. The commissioner made report in pursuance of said decree, and, among other things, did not see how Kent could claim a lien on the Dashiell interest in the land by reason, as he claimed, of his having paid a part of a certain claim against the estate, known as the "Gordon debt." On November 30, 1877, the court recommitted the report for further account, showing the amount due Dashiell and wife for rents. On the ninth October, 1878, said commissioner filed his report, wherein he stated that the amount due Dashiell and wife for rent of Hawthorne amounted to $896, and that as between the heirs and creditors of R. S. Voss, deceased, and the heirs of H. L. Kent, the Gordon debt, or the balance thereof, should be paid by the Kent heirs, because Kent had agreed with the Voss heirs and commissioners of sale to pay this debt,—had bought from the court subject to this debt, and had retained of the purchase money the amount of the said lien. To this report the defendants filed two exceptions : (1) Because the commissioner reported the Gordon debt against Kent's, and not Voss' estate ; and (2) because rent was allowed Dashiell and wife. On the twenty-ninth day of November, 1878, the bankruptcy of John Jett, Joseph Reid, Carnet M. Walden, and Daniel W. Botts was suggested, and it was ordered that Thomas L. Michie and Henry S. Menefee, their assignees, be made parties plaintiffs to this suit ; and it was adjudged and decreed that six twenty-fifths of the real estate of R. S. Voss should be offered for sale, provided the six twenty-fifths of said land should sell for more than six twenty-fifths of $7,000, with interest thereon from January 1, 1861. And on the same day a decretal order was entered, so amending the above decree as to require the commissioners of sale therein named to sell

said estate without any proviso or limitation.   On the twenty-third March, 1881, the commissioners of sale reported that they had been offered $2,500 for Mrs. Dashiell's interest in the Hawthorne estate, being six twenty-fifths thereof, by Mr. W. F. Anderson, who had complied with the terms of the sale, and thereupon a decretal order was entered confirming said sale, and directing the commissioners to pay the costs in these causes out of the cash payment of $200 reported to the court.   On the twenty-third March, 1882, a decree was entered, requiring the bonded commissioners of sale to collect the purchase money, and to pay the same over to the administrator of H. L. Kent, deceased, and, upon a suggestion that the creditors of R. S. Voss proposed to take an appeal from this decree, the same was suspended for 90 days, upon the execution of a bond, in the penalty of $200.   And this is the final decree.   Henry S. Menefee, assignee, etc., and others, appeal.

*J. C. Gibson* and *James Lyons*, for appellants.

*J. Y. Menefee* and *Meredith & Cocke*, for appellees.

FAUNTLEROY, J., delivered the opinion of the court.

This is an appeal from a final decree of the circuit court of Rappahannock county, rendered on the third day of March, 1882, in the chancery cause pending therein, and from the prior interlocutory orders of the said court, and of the circuit court of Albemarle county, entered in the said cause.   The facts disclosed by the record are as follows : Robert S. Voss, a citizen and resident of Rappahannock county, Virginia, died in that county in August, 1861, intestate, leaving his widow, Mrs. Mary F. G. Voss, and five children, his sole heirs, viz.: Mary F., wife of Julius M. Dashiell, residents of Baltimore, Maryland ; Caroline H., wife of Morton Marge, Virginia ; Emily G. Voss ; Susan F.

Voss; and Philip T. Voss, who became of age, and died in 1862, unmarried and childless and intestate. The said Robert S. Voss, at his death, owned 22 or 23 slaves, of the average value at that date of probably $800,—aggregating $17,600,—and stock for his farm and other personalty to amount of $4,000 or more ; and he owned in his own right 510 acres of land, with five dwellings and other valuable improvements upon it, joined to which was a tract of nearly 23 acres belonging to his wife, by a deed of 1850 from her father, Philip Thornton,—the whole making a farm within a fraction of 533 acres, called "Hawthorne," worth, probably, then not less than $20,000, as after the ravages of war it was worth $35 per acre. This tract of 533 acres was subject to only one specific lien,—that of a deed of trust executed in 1860 by said Robert S. Voss and his wife to J. S. Knox, Jr., in trust to secure a debt of $7,000, with interest from January 1, 1861, to Douglas H. Gordon, trustee for two minors, Bazil T. Gordon and Skipwith Gordon. Voss owed other debts which at his death amounted to about $17,000 or $18,000, which, though probably payable out of the slaves and other personal property, were general liens on his realty after dower, and the deed of trust for benefit of Gordon. No attempt appears to have been made to administer his personalty prior to 1864, nor to pay his debts, which were left to accumulate by accruing interest. Morton Marge qualified as his administrator, but when does not appear. He speaks of himself as administrator in March, 1864. Voss' widow and two single daughters lived at Hawthorne, and when the Confederate army fell back south of the Rappahannock, they in a panic left Hawthorne, and, with Mrs. Marge, became refugees in Albemarle county, sending the slaves to Pocahontas county. They and Morton Marge desired and determined to keep the slaves, and to sell "Hawthorne," and pay the debts out of the proceeds of the sale of the lands, to exoneration of the slaves and

other personal property. In this matter Mrs. Dashiell and her husband were not consulted.

To this end, the original suit in the cause was begun in the circuit court of Albemarle by process issued twenty-sixth February, 1864, and by publication in the Lynchburg Virginian as to Dashiell and wife, then in Maryland, and within the Federal lines, and under Federal authority, within the Union. At the March rules, not later than eighth of March, 1864, the original bill was filed in the circuit court of Albemarle in the names of Marge and wife against Mrs. Voss, Mrs. Dashiell and her husband, the two single daughters, the trustee Knox, D. H. Gordon, trustee, and the two minors, Bazil T. Gordon and Shipwith Gordon. The bill, as is admitted, and as is manifest by the proceedings, was brought to consummate a sale of "Hawthorne" to Horace L. Kent which had been verbally negotiated by conveyance to him, through the court, of the title of Mrs. Dashiell, the non-resident heir, and for the confirmation of the sale, and distribution of the proceeds of sale to the widow and heirs. It describes Marge as administrator, and, as such, a party, and avers that there is the lien of the deed of trust for the Gordon debt, and also other debts, the payment of which it is desired to throw upon the land ; and the court in its subsequent proceedings, and after the sale, ordered an account of debts, and a settlement of Marge's accounts as administrator. After the filing of the original bill, Marge and wife, the widow and the two single daughters (Philip T. Voss being dead) entered into a written contract or "preliminary agreement," dated eighteenth March, 1864, with Horace L. Kent, of Richmond, for the sale of the 533 acres of "Hawthorne" for $118.75 per acre, payable in Confederate bonds and currency. Kent's Confederate currency and bonds were depreciating, and he was anxious to unload them by investment in this Rappahannock farm, in spite of the presence or threatened occupancy by the enemy ; and he was

met by these parties, who were anxious to exchange their land for this currency. This preliminary agreement, and the subsequent deed of twenty-first of March, 1864, have an important bearing on the questions at issue and show the intent and obligations of Kent in the contract.

The parties of the first part sell ("hereby") to Kent the whole 533 acres at one uniform price, $118.75 per acre, describing the tract as composed of Mrs. Voss' 23 acres and the 510 acres owned by R. S. Voss. Kent agrees to pay the purchase money arising from the 23 acres to Mrs. Voss in Confederate currency of the then issue on the signing of the agreement, and reciting the Gordon debt, and deed of trust stipulates that "so much of the purchase money as is equal to that debt, including interest to this time, is to be retained by Kent, who, in part payment for his purchase aforesaid, assumes the payment" of the said trust debt, and covenants that he will fully and completely protect and save harmless them, the parties of the first part, and not only them, but the estate of R. S. Voss, deceased, and also each and every person claiming under him (R. S. Voss), from all loss or liability in regard to that debt. Of the remaining purchase money, after deducting payment to Mrs. Voss for the 23 acres, three-fourths is to be paid on the signing of the agreement to the parties of the first part in Confederate money of the then issue, with the proviso that the parties of the first part shall have executed a deed conveying all their interests to Kent, to be held as an escrow, to be delivered to Kent when a competent court of chancery shall decree a deed, and the same be executed, vesting in Kent the title of Mrs. Dashiell to her share. The remaining one-fourth of the purchase money for the 510 acres to be held by Kent subject to the order of the circuit court of Albemarle in the suit which the said parties of the first part have instituted, and which they agree to conduct, with a view to obtain the sanction of the court to this agreement ; and should it be found imprac-

ticable to obtain, by decree of the court in this suit, a transfer of Mrs. Dashiell's title to Kent, yet the agreement and conveyance of the other shares to be binding.

In accordance with this preliminary agreement, the parties of the first part executed the deed of twenty-first of March, 1864, and Kent united in it, in which they warrant generally the 23 acres of "Hawthorne," except as to the lien of the Gordon trust debt, and in which deed Kent and the other parties put the emphatic clause: "Now, in regard to this debt, it is expressly understood that there has been left in the hands of the purchaser, said H. L. Kent, a sufficient amount of the purchase money to pay the same; in consideration of which Kent covenants that he will hereafter pay off and discharge the same." This deed of the twenty-first of March, 1864, was retained as an escrow until after the decree of the circuit court of Albemarle for sale, and after the sale in accordance with the agreement and deed, and after Kent had retained out of the first installment of purchase money what he deemed sufficient to pay this debt, and fully to discharge it, and which he so retained as full consideration for his covenant to pay and discharge the specific lien which bound the whole 533 acres, Mrs. Voss' 23 acres, the three-fourth interest of the parties, and Mrs. Dashiell's interest. The deed of the twenty-first of March, 1864, was admitted to record in the ———— court of Richmond city, twenty-first July, 1864, and in clerk's office of Richmond county court on twenty-first November, 1864. These papers, though not united in by Mrs. Dashiell, show conclusively the express agreement, understanding, and intent of the said parties on both sides, Voss, Marge, and Kent, that the Gordon debt was to be paid by Kent out of the purchase money; enough —a sufficiency—of which was to be and was retained by Kent, and that this retention was the end of the lien of the said Gordon debt, and a bar against all claim by Kent, or by any one, on account of the said Gordon debt, as fully as

if the commissioner of sale had taken the purchase money, and paid it on the Gordon debt. This is the deed under which Kent held; and his acceptance of it, after he had retained enough of the purchase money to pay the Gordon debt, and had paid to the parties of the first part the residue, is conclusive that the amount so retained was sufficient, and was a full and final consideration for his assumpsit and express covenant to pay the Gordon debt, and bars all subsequent claim by Kent upon any owner of any part of "Hawthorne."

This contract shows, too, that Kent laid great stress on the suit then instituted, the bill in which had then been filed, and he must be conclusively presumed to have known its contents, and thus to have been advised of the fact that there were debts, other than the specific lien of the Gordon debt, which were general liens on three-fourths of the 510 acres, which he took by the deed of twenty-first March, 1864, and which had precedence of Mrs. Voss' claim on the 23 acres conveyed by her to Knox, trustee; that is, that they were general liens on the whole 533 acres, after the application of the whole 533, *pro tanto*, to the specific lien of the Gordon debt, on all of it. The record shows that the Albemarle circuit court on tenth of May, 1864, did decree a sale at public auction or private sale of the whole of "Hawthorne," to be made by E. R. Watson and N. H. Massie, commissioners of sale, and that they on the next day, eleventh of May, 1864, sold it to Kent, in accordance with the sale which had been made before by the widow and heirs, for the uniform price of $118.75 per acre for all. Had it been advertised and sold at public auction to the highest bidder, it might, in the desire to invest Confederate currency, have brought very much more, perhaps double that price. The commissioners of sale reported the sale, and also that Kent had retained and had been allowed credit for the amount of the purchase money, which he (Kent) deemed sufficient to

pay the Gordon debt, and had paid the whole residue of the
purchase money for which the commissioners of sale added
a distributive account, deducting, after the Gordon debt,
$1,469.09 for expenses ; $2,728.28 for Mrs. Voss, for the
23 acres ; $8,000 for widow's dower ; $17,500 for debts ;
and then apportioned the residue among the widow and
heirs.

The circuit court on the twelfth of May confirmed the
entire report, and decreed a deed to be made by the com-
missioners of sale, to Kent, for the whole tract, though there
is nothing in the record to show that this deed was ever made,
or that Kent has any deed except the deed of twenty-first of
March, 1864 ; and the decree directed the commissioners to
pay according to their report, and to retain Mrs. Dashiell's
part ; and ordered that one of its commissioners in chancery
state and report the debts of R. S. Voss, to be paid out of
the land fund, and also an account of his personalty, and an
administration account of Marge, administrator ; the decree,
sale, confirmation of sale, and distribution of proceeds,—all
done in three days.   October 17, 1864, the commissioners
of sale made a second report of what they did with the fund
of the purchase money, without waiting for the master com-
missioner's report of debts, and stating that they paid
$4,032.12 to the bank at Fredericksburg, and $7,686.41 to
the Farmers' Bank of Virginia, at ———, by mistake in pay-
ment of notes due at the Branch Bank, at Alexandria, which
had been already paid by B. F. Voss,—in all $11,718.41;
leaving only the balance (of the $17,500) of $5,750, which
they invested in Confederate bonds, though it is never
heard of afterwards.   This report is approved and confirmed
by decree of October 17, 1866, two years afterwards,
although the master had returned a report under the decree
showing other debts than those paid by the commissioners
of sale to the amount of $16,435.23 general liens on the land,
and among which are the debts claimed by the appellants

here.    He also reports a balance due by Marge, administrator, of $1,843.16, and a list of slaves estimated at $50,000, who all became emancipated in April, 1865.    This report of the master commissioner, Shackelford, was confirmed by the decree of seventeenth October, 1866, and by the same decree the circuit court of Albemarle, having made no provision for the general debts and liens of appellants and others, ordered the cause to be sent to the circuit court of Rappahannock county, where it was docketed fifth of October, 1868.

The appellants having thus been wholly ignored and left out in the cold by the Albemarle circuit court, and its commissioners of sale, filed by leave their bill of review in the circuit court of Rappahannock county, adding Kent to the parties defendant to the original bill, and the proceedings subsequently had resulted in the decree of twenty-third March, 1872, from which this appeal is taken.

The first question presented is as to the jurisdiction of the Albemarle circuit court in the premises, which is denied by the appellants, who, as complainants in the bill of review, aver that the courts were organized and held in Rappahannock county on twenty-sixth February, 1864, and that there was actually pending in the county court of Rappahannock a suit for the sale of ''Hawthorne,'' but as no direct proof of this fact is in the record, and the objection now made to the jurisdiction was not pressed, and as if the whole proceedings in the original suit be now annulled, it would make inextricable confusion of titles and operate irretrievable injustice, it is best to consider that the objection to the jurisdiction of the Albemarle court is not well taken.    The circuit court of Rappahannock decided, rightly, that the title of Mrs. Dashiell was not transferred to Kent, nor her interest in any way affected by the proceedings had in the original suit. She could not be affected where she was not a party, and she could not be a party unless she had legal notice ; and being .

a resident of Maryland, and in the enemy's lines, she could not have legal notice by publication in Virginia. *Vide* Darr v. Rohr, 10 Va. Law J. 720, and cases cited. She is tenant in common with Kent and his heirs, to the extent of her heritable share of her father's (R. S. Voss') realty bought by Kent; which share the court ascertained and decided to be six-twenty-fifths of the 533 acres of "Hawthorne." Mrs. Dashiell's title was not and could not be affected by the proceedings had under the bill of review. There is not a particle of evidence in the record to show that she and her husband were parties. It is true, they were named as parties defendant, and summons as to them is prayed for in the bill of review, but they had been non-residents during the beginning and progress of the original suit, and, there being nothing to show that they had since become resident in Virginia, the presumption is that they continued to be non-resident. There is nothing to show that they had personal service of process, nor that any publication was asked or made as to them, nor does the decree set out that the complainants had proceeded in the mode prescribed by law to mature the cause as to them. Indeed, the complainants and the court treated the bill of review as simply a continuation of the original suit, and as the court of Albemarle had theretofore considered the publication, in a Lynchburg paper, legal and sufficient to make Mrs. Dashiell and her husband parties, it was taken for granted that they were parties without further publication. Neither of them appeared by counsel or in person, and being non-residents, and within the enemy's lines, and no publication ordered or had as to them, they were no more parties to the proceedings had under the bill of review than they were under the original bill; and all the decrees or proceedings had adverse to them were nullities, and the sale of Mrs. Dashiell's share or interest in "Hawthorne" to Anderson, as aforesaid, was null and void. This court cannot assume so important a.

fact, of their being parties, without evidence, and on
mere presumption; and especially in the face of their hav-
ing been non-residents, and not parties theretofore.

But even had she and her husband been legally and regu-
larly made parties defendant to the bill of review, the cir-
cuit court erred in deciding that her six-twenty-fifths share
of the 510 acres of Hawthorne was liable to Kent's estate
for any part of the Gordon debt; and it erred in decreeing
a sale then of six-twenty-fifths of which she was owner,
subject to no lien, unless it were to six-twenty-fifths of the
lien of the general creditors, unpaid, and even if to this
extent she were on her six-twenty-fifths liable, there should
have been no sale of her said six-twenty-fifths until that
liability had been abjudicated, and the amount due on the
said general debts ascertained and determined by report and
decree, and time given her to pay her ascertained part of
such liability, if she chose, without sale.

The circuit court erred in deciding that Kent's heirs had
any lien or claim on Mrs. Dashiell's share of the land by
assignment of or by subrogation to the lien of the trust for
the Gordon debt, because, though Gordon might have en-
forced the lien for any part of the debt unpaid to him or to
his *cestuis que trust* (in which case Mrs. Dashiell could have
had recourse to Kent, or have compelled Gordon to resort
first to Kent's three-fourths of the 510 acres), yet Kent had
no claim on her; for if he paid off the Gordon debt, he paid
it according to his express contract, and with the money of
the Voss heirs, certainly not with his own, and therefore he
could not become assignee of the Gordon debt and lien, nor
entitled to subrogation thereto as against the estate of R. S.
Voss, or any one claiming under him.   Kent purchased the
tract of land "Hawthorne" by the "preliminary agreement"
in writing, and he holds title under the deed of twenty-first
March, 1864, sanctioned by the Albemarle circuit court;
and no one can read those papers and doubt that Kent was

to pay the Gordon debt out of the purchase money, and that he so expressly understood, intended, and covenanted to do, by retaining so much of the purchase money as should be sufficient for that purpose.  He had the right to judge of that sufficiency, and the power to do it, as the money was in his hands, and due by him as purchaser.  He did so retain, and by his acceptance afterwards of the deed of March 21, 1864, united in by him, he is estopped to deny that he had retained, enough of the purchase money—Voss money —due by him to pay the Gordon debt, and that it was a full consideration for his assuming and paying the Gordon debt. He covenanted with the parties to the "preliminary agreement" and the deed of March, 1864, to fully and completely protect them and Voss' estate, and all claiming under Voss, from all liability for this debt, which he could not do except by paying it with Voss' money, retained by him for the express purpose, and intended by him and the other parties to the contract to be in full of any recourse to Voss' estate or heirs.  True, he retained only $7,000, and the interest, aggregating $8,351, the amount of the debt in par funds, but he did this in execution of his own express covenant and understanding, as explicitly stated in the contracts by which he got his title.  Kent and his estate must be held to his retention, and to the sufficiency of the amount retained as his own voluntary act ; and he, nor his estate, can be entitled to no demand on Mrs. Dashiell, or any one claiming under R. S. Voss, for any part of the Gordon debt, either as assignee or by subrogation.

The circuit court erred in deciding that Kent's heirs were entitled to the proceeds of sale of Mrs. Dashiell's undivided share or interest in the land, or that it is liable for the costs. The debts of the general creditors (appellants) accrued before the war, and were general liens on the realty of R. S. Voss as fully as a judgment or deed of trust could be as against the heirs of Voss and purchasers from them with

notice.   They were none the less general liens on the realty because there was personalty enough to pay them ; and the waste or dissipation of the personalty by mismanagement or *devastavit* by misfeasance or malfeasance of the administrator or distributees and heirs, or by the erroneous act of court, whereby the payment of these debts out of the personalty was prevented, cannot destroy or weaken that lien on the land descended to and in the hands of Voss' heirs, or in the hands of a purchaser from them with knowledge or notice of debts constituting such general lien.   See Code, 1860, §§ 3, 4, 5 ; McCandlish v. Edloe, 3 Gratt. 330 ; McCandlish v. Keen, 13 Gratt. 615 ; Harvey's Adm'r v. Steptoe's Adm'r, 17 Gratt. 289 ; Insurance Co. v. Maury, 75 Va. 512 ; Woodhouse v. Fillbates, 77 Va. 320.

By the Code of 1860, the real estate of the intestate, R. S. Voss, was assets in the hands of his heirs for payment of his debts :   (1) Of the lien of the deed of trust to Gordon ; (2) the general debts *pro rata*, as there were no judgments at his death.   This realty the heirs could sell, but became personally liable to the extent of the assets aliened, if at the time of the conveyance no suit had been commenced for the administration of the said real assets, nor any report had been filed of the debts and demands against the estate of the intestate.   In this case suit had been commenced in Albemarle circuit court before February 26, 1864, and the bill was filed March 8, 1864, for administration of R. S. Voss' real assets—First, to pay the Gordon lien ; and, secondly, the other debts to exonerate the slaves.   The administrator, Marge, was a party, and was complainant.   The bill named the fact, and supposed amount of the general debts, and the court did by its decree, etc., administer the real assets. The purchaser, Kent, in the contract of eighteenth of March, 1864, was averse to this suit, and the object of it, and made its prosecution a condition, and its decree a condition precedent.   He knew from the bill that there were other

debts, to a large amount named in the bill, which were general liens. The decree of twelfth May, 1864, which sanctioned his "preliminary agreement," and his contract of purchase, ordered an account of the general debts of Voss, and their order of priority. Kent therefore took the land subject to the lien of the general creditors, and he is liable therefore to the extent of his purchase and acquisition of "Hawthorne." The whole tract of 533 acres was sold together, and out of the proceeds of sale the Gordon debt is entitled to payment as a lien prior to that of the general creditors, to whom Kent's estate is liable, to the extent of three-fourths of the whole tract, less the Gordon debt, as of the day of sale, and the circuit court erred in its decree exonerating Kent's estate from liability to the general creditors. Mrs. Dashiell is under no personal liability to the general creditors, for she has never sold her heritable interest, but her six-twenty-fifths of the 510 acres (the 533, less 23 acres) is liable still to the lien of appellants' debts.

There is no just reason for estimating Mrs. Dashiell's six-twenty-fifths at a lower rate of value than the residue of "Hawthorne." The whole 533 acres sold for a uniform price of $118.75 per acre. It is shown that Mrs. Voss' 23 acres was estimated at $35 per acre by defendant Kent's own witnesses, and there is no reason in the record why the whole 533 acres is not worth at least that now, and at that rate Mrs. Dashiell's six-twenty-fifths of the 510 acres (533 less 23 acres) is $4,044, instead of $2,500, which it sold for, and from which costs were improperly decreed and were taken. Nor is there any reason why the Hawthorne tract of 510 acres should be put down at only $10,000. Its proved value in the record is $16,850. The decrees complained of are right, so far as they decide that Kent is tenant in common with Mary T. Dashiell, and in holding that the sale of the Hawthorne tract, less the interest of Mrs. M. T.

Dashiell, was a valid sale, and in further holding that H. L. Kent, or his estate, are not liable to the unpaid creditors of R. S. Voss, for the rents and profits of three-fourths of the Hawthorne tract, and in so far they are affirmed; but the said decrees are erroneous in holding that H. L. Kent, or his estate, is entitled to subject the said interest of Mrs. M. T. Dashiell to pay a proportionate share of the debt due to D. H. Gordon, trustee, and in decreeing costs against her or her said share, and in holding that the unpaid creditors of R. S. Voss, deceased, are not entitled to have the said interest of Mrs. M. T. Dashiell sold for the benefit of the said unpaid creditors; and, as to these matters, the said decrees are reversed and annulled, and the cause will be remanded to the circuit court of Rappahannock county, with instructions to make Mrs. M. T. Dashiell and her husband parties, and to proceed in the cause in accordance with the views expressed in this opinion, and the accompanying order, which will be certified down.

Affirmed in part, and reversed in part.

LEWIS, J., absent.